IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BRADLEY ESTEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ADT LLC, and IPACESETTERS, LLC, | : | CIVIL ACTION NO. |
| | : | 1:16-cv-3141-AT |
| Defendants. | : | |

## **ORDER**

This putative class action under the Telephone Consumer Protection Act ("TCPA") is before the Court on the parties' Joint Discovery Statement [Doc. 32].

Plaintiff, Bradley Estey, a customer of Defendant ADT, filed this suit as a result of receiving multiple unsolicited telemarketing calls on his cellular telephone from ADT for the purpose of selling him an upgrade on his current home security system.[1] Plaintiff contends that ADT engaged in unlawful telemarketing under the pretext of performing a customer service call in order to schedule an appointment to convert Plaintiff's older 2G alarm system to a newer 3G alarm system, as a result of cellular network providers phasing out the 2G cellular network. Plaintiff alleges that "while the free 2G conversions are one

---

[1] On January 9, 2017, the Court granted Plaintiff leave to file an Amended Complaint (without objection) adding iPacesetters, LLC, as a party defendant. According to the Amended Complaint, Defendant ADT hired iPacesetters to place the telemarketing calls at issue in this lawsuit on ADT's behalf. The Court refers only to ADT in this Order for ease of reference, and because the parties similarly refer solely to ADT in their Joint Discovery Statement.

purpose of the calls, Defendant ADT uses the conversion appointments made on these telephone calls in an attempt to 'upsell' customers on premium systems, such as the ADT Pulse, which are not free." (First Am. Compl., Doc. 29 ¶ 20.) Plaintiff further alleges that this purpose is evident from ADT's call scripts, which state, in part:

> I am calling today to follow up on a recent letter that ADT mailed to you regarding the cellular communicator of your security system. Mr. Estey, I am reaching out to inform you that your system currently uses 2G wireless technology, which cellular carriers will be phasing out and moving all networks to 3G technology. Therefore, your security system's 2G unit needs to be replaced. Now, Mr. Estey, I am going to make it easy for you to get your new 3G unit installed at no cost, **and possibly upgrade your system to continue to keep your home safe**.

(*Id.* ¶ 21.)   According to Plaintiff, during one such call on May 16, 2016, he asked ADT to stop calling, but has since received at least 18 calls from ADT.

Plaintiff's Amended Complaint also references ADT's own documents as confirming ADT's use of the 2G conversion calls for the purpose of upselling customers:

> For example, in its Q1 2016 Conference Call, Defendant ADT stated: "In Q1 we incurred $24 million of radio conversion costs as we successfully converted 124,000 2G customers, a portion of which we were able to upsell to ADT Pulse." (¶ 22.)
>
> Similarly, in its Q2 2015 Conference Call, Defendant ADT stated: "In Q2 we continued to make progress on our 2G radio conversion project, upgrading 82,000 customers, a portion of which we were able to upsell to ADT Pulse."  (¶ 23.)
>
> In an investor day presentation dated May 14, 2015, Defendant ADT wrote, on a slide titled "Improving Attrition: We Have Significantly

>
> Increased Pulse Among New & Existing Customers", that it "[l]everaged 2G to 3G conversion opportunities to upgrade to Pulse." (¶ 24.)

(*Id.* ¶¶ 22-24.)

A discovery dispute has arisen out of Defendants' objections to five of Plaintiff's discovery requests – Interrogatories 11-13 and Requests for Production 18 and 19:

> Whether the following information (and related discovery) is relevant in this matter:
>
> 1) whether ADT's representatives, agents, technicians, or similar attempted to "upsell" ADT products on appointments made for 2G to 3G alarm system conversions;
>
> 2) whether ADT's representatives, agents, technicians or similar were instructed or trained to "upsell" ADT products on those appointments;
>
> 3) ADT's metrics and financial information related to any such "upselling."

(Doc. 32 at 1.)

The TCPA prohibits ADT from engaging in "telemarketing" using an automatic telephone dialing system without the prior express written consent of the recipient. *See* 47 U.S.C. § 227(b)(1); 47 C.F.R. § 64.1200(a)(2); In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 27 F.C.C.R. 1830 (Feb. 15, 2012) (revising Federal Communications Commission's rules to require prior express written consent for all autodialed or prerecorded telemarketing calls to wireless numbers). "The term telemarketing

3

means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(12).

Defendant contends that the discovery Plaintiff seeks regarding the training and conduct of ADT's service technicians during in-person service appointments for the 2G/3G conversion and the revenue ADT generated from in-person sales of Pulse systems during its 2G/3G campaign is not relevant to Plaintiff's claim that ADT engaged in prohibited telemarketing in violation of the TCPA.

Plaintiff contends that information on ADT's use of the conversion appointments to upsell products is relevant in determining whether the telephone calls made to schedule the appointments (during which ADT mentioned the possibility of upgrading the free 3G system to a premium system) are considered telemarketing. Plaintiff asserts that because ADT initiated the telephone calls to its customers with the intention of using the 2G/3G conversion appointments to upsell its premium systems, the telephone calls had dual-purposes: (1) to schedule an appointment to perform the necessary conversion and (2) to use the conversion appointment to upsell its customers on more premium equipment, such as the Pulse system. Plaintiff argues the requested information regarding "upselling" is relevant to his claim because the purpose of

4

ADT's telephone calls, and not simply their content, determines whether the telephone calls are prohibited under the TCPA as "telemarketing."

As the Agency charged with implementing the Act and regulating conduct under the Act, the FCC has articulated a standard in evaluating "dual-purpose" robocalls:

> The Commission asserted that in evaluating dual-purpose calls, it would determine whether the call includes an advertisement. The Commission provided that if the call, notwithstanding its free offer or other information, is intended to offer property, goods, or services for sale either during the call, or in the future, that call is an advertisement.

27 F.C.C.R. 1830, 1842 ¶ 30. Similarly, in analyzing whether a prerecorded message constitutes prohibited telephone solicitation, the FCC has explained that the determination does not turn on the caller's characterization of the call, but on the purpose of the message. *Id.* 1842-43 ¶ 31. The FCC considers the facts on a case-by-case basis to determine whether an alleged dual-purpose telephone call violates the TCPA because the primary motivation appears to be sending a telephone solicitation or unsolicited advertisement rather than some other lawful or legitimate purpose. *Id.* at 1843 ¶ 31; *see also Golan v. Veritas Entm't, LLC*, 788 F.3d 814, 820 (8th Cir. 2015) ("Telemarketing" occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services . . . Since the calls were initiated and transmitted to the Golans in order to promote Last Ounce of Courage, they qualified as 'telemarketing' even though the messages never referenced the film . .

5

. Even when the intended content of a message is not conveyed, the intrusion into the home and the "seizure" of the phone line is the same."); *Morris v. Unitedhealthcare Ins. Co.*, 2016 U.S. Dist. LEXIS 168288, *24 (E.D. Tex. Nov. 8, 2016) ("Pursuant to its delegated authority, the FCC has determined that 'dual purpose' calls, those with both a customer service or informational component and a marketing component, are prohibited and constitute telephone solicitations.")

The Court finds Plaintiff's requests for information on ADT's training on upselling and the revenue generated from its campaign to upsell is probative of ADT's purpose in making these telephone calls and thus whether the calls violate the provisions of the TCPA. ADT's objections go more toward whether Plaintiff will be able to prevail on the merits of his claim. Further, ADT seems to contend that the information requested is not relevant to the extent it deals with upselling occurring after initial phone calls, whether during in-person appointments or otherwise. The Court notes that in response to Interrogatory No. 12, in addition to stating its relevancy objection, ADT stated that "it did not train, direct, incentivize, commission, promise, or threaten its employees, representatives, agents, or contractors to encourage the upsell of premium ADT systems, such as ADT pulse, during ADT's 2G/3G campaign." (Doc. 32-1 at 10.) ADT's position appears belied by the allegations in Plaintiffs' Amended Complaint (based on quoted passages from ADT documents) that indicate ADT undertook an

6

organized effort to capitalize on the necessary 2G to 3G conversion. Thus, to the extent ADT withheld, on relevancy grounds, information and documents regarding the company's programmatic training of its customer service representatives related to the 2G-3G replacement/conversion campaign, ADT is **DIRECTED** to produce the information. ADT is not required to produce information regarding the training or conduct of each employee on an individualized basis.

ADT further objects that "the relevance of any revenue data is not proportional to the burden and time expense ADT would face in attempting to collect that information" and indicates that if necessary, ADT will provide the Court with an affidavit outlining the time and expense required for such a search. Based on the information cited in Plaintiff's Amended Complaint from ADT's own documents, the Court suspects that ADT likely has tracked the financial success of its 2G/3G campaign and has already available some information on the revenues generated, generally, as a result of "upselling" its existing 2G customers to premium equipment such as the Pulse system. The Court is not requiring ADT to produce revenue based on a call-by-call breakdown in the manner described by ADT in footnote 1 of the Joint Discovery Statement in response to the discovery requests.[2]

---

[2] To the extent ADT conducts such a breakdown for purposes of its defense, ADT shall provide the additional information to Plaintiff.

7

Accordingly, the Court **ORDERS** ADT to provide responses to Plaintiff's Interrogatories 11-13 and Requests for Production 18 and 19 **NO LATER THAN FEBRUARY 15, 2017**.  To the extent the requested revenue data/information is not readily available, ADT **SHALL** confer with Plaintiff in an attempt to reach an agreement as to a reasonable limitation on the scope of the information as necessary, and to submit an Affidavit outlining the necessary steps to collect the revenue data, and the time and expense required for such collection **NO LATER THAN FEBRUARY 22, 2017**.  Defendant is **ADVISED** that in opposing production on proportionality grounds, it has the "burden of factually demonstrating that a particular request is so burdensome or expensive that it is disproportionate to the issues in the case. That burden cannot be satisfied, however, through boilerplate arguments that do not meaningfully provide the Court with the specificity required to make such an assessment." *Lombardi v. NCL (Bahamas) Ltd.*, 15-20966-CIV, 2015 WL 12085849, at *1 (S.D. Fla. Dec. 11, 2015) (citing Adv. Comte. Note, 2015 Amdt); *Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*, 312 F.R.D. 673, 676 (S.D. Ga. 2016) ("It remains true today both that claims and defenses provide discovery's outer bounds and that 'the court is inclined to err in favor of discovery rather than against it.")  The parties are **DIRECTED** to contact the Courtroom Deputy Clerk to schedule an immediate conference with the Court in the event disputes arise regarding the scope and/or implementation of this Order.

**IT IS SO ORDERED** this 26th day of January, 2017.

_____
**Amy Totenberg
United States District Judge**