UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BRADLEY ESTEY, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br>     v.<br><br>ADT LLC, iPacesetters LLC,<br><br>                  Defendants. | Civil Case No.: 16-cv-3141<br><br><br>Judge: Hon. Amy Totenberg<br>Motion Date: June 12, 2017 |

**<u>Plaintiff's Brief in Support of Plaintiff's Motion for Class Certification And in Opposition to Defendant's Motion to Deny Class Certification</u>**

## I.     Introduction

Defendant ADT LLC, on its own and through its agent iPacesetters, placed calls to Plaintiff and putative class members' telephone numbers, ostensibly to schedule an appointment to upgrade Plaintiff and class members' alarm systems from expiring 2G technology to newer 3G technology. But Defendants' call campaign[1] was a Trojan Horse: Defendant ADT intended to, and did, use the "free upgrade" appointments to upsell its customers on premium products. Defendant ADT openly bragged about its success in doing so and, indeed, many of the call scripts and instructions provided to its employees and agents during the class period indicate the dual-purpose nature of these calls. Exacerbating matters, some

---

[1] Hereinafter, this campaign is referred to as the "2G/3G Conversion Campaign."

of the calls Defendants made were from one of the telephone numbers Defendant ADT uses to tell its customers that their home security alarms were going off, making it impossible for Plaintiff or putative class members to safely block the incoming telephone number. Thus, Defendants' deceitful telemarketing campaign not only implicates the very right to privacy the TCPA was enacted to protect, it was dangerous.

## II. The TCPA.

"Voluminous consumer complaints about abuses of telephone technology … prompted Congress to pass the [Telephone Consumer Protection Act] TCPA." *Mims v. Arrow Fin. Svcs., LLC*, 132 S. Ct. 740, 744 (2012). In enacting the TCPA, 47 U.S.C. § 227, Congress found that "[u]nrestricted telemarketing… can be an intrusive invasion of privacy [and that] [m]any consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." TCPA, Pub. L. 102–243, § 2, 105 Stat. 2394 § 2, ¶¶ 5-6 (Dec. 20, 1991) (Congressional Findings).

To help curb such abuses, Congress, through the TCPA, required the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). The FCC was explicitly instructed to "compare and evaluate alternative methods and procedures (including the use of …

company-specific 'do not call systems … )" and "develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section." *Id.* at (c)(1)(A) and (E).

In doing so, the Federal Communications Commission determined that the most efficient, effective, and economic manner to protect such privacy rights was to require that anyone making telephone solicitations must institute minimum procedures to maintain and honor internal do-not-call ("IDNC") requests *prior* to making any telephone solicitation calls. 47 C.F.R. § 64.1200(e)(2)(1992);[2] *Rules and Regulation Implementing the Telephone Consumer Protection Act*, 7 FCC Rcd. 8752, ¶ 24 (1992). In 2003, the FCC amended its regulations to prohibit all *telemarketing* unless the caller had instituted the required minimum procedures, and it extended these protections to wireless subscribers.[3] *Rules and Regulation Implementing the Telephone Consumer Protection Act*, 18 FCC Rcd. 14014, ¶ 96 (2003); 47 C.F.R. § 64.1200(d); (e) (2003) (amended regulation).

The FCC's internal do-not-call list ("IDNC") regulations provide:

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has

---

[2] In enacting the 2003 Amendments, the FCC reorganized section 64.1200. The updated regulation is now found at 47 C.F.R. § 64.1200(d).

[3] *Cf.* 47 C.F.R. § 64.1200(f)(12) (2015) (defining *telemarketing*); 47 C.F.R. § 64.1200(f)(14) (2015) (defining *telephone solicitation*).

instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity.

47 C.F.R. § 64.1200(d). Relevantly, the procedures required *must* include the following:

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d) (2003).

A company that makes a telemarketing telephone call without having implemented these minimum procedures violates section 227(c) of the TCPA. *Charvat v. GVN Mich., Inc.*, 561 F.3d 623, 632 (6th Cir. 2009); *see also Charvat v. Dfs Serv. LLC*, 781 F. Supp. 2d 588, 592 (S.D. Ohio, 2011). In order to prevail on a 227(c) TCPA claim, "the plaintiff must establish that the calls he or she received were initiated prior to the implementation of proper procedures." *Simmons v. Charter Comm.*, Case No. 15-cv-317, 2016 U.S. Dist. LEXIS 42091, *40 (D. Conn. 2016) *aff'd* 2017 U.S. App. LEXIS 6004 (2nd Cir. 2017). "A telemarketer violates this subsection not by placing the calls themselves, but by failing to have the required procedures in place prior to the initiation of the calls." *Id.* "[A] proper policy does not shield a defendant from liability if it is not fully implemented[,] [and] proof of failure to implement existing plan can support a TCPA violation for failure to have a proper procedure."" *Id.* (citing *In the Matter of Dynasty Mortgage*, *L.L.C.*, 22 F.C.C. Rcd. 9453, 9466 (2007)).

As for the division of liability between co-Defendants ADT and iPaceSetters, "calls placed by a third party on behalf of that company are treated as if the company itself placed the call… Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company

and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation regardless of whether the consumer continues to do business with the company." *State Farm Decl. Ruling*, 20 FCC Rcd. 13664, 13667-668, ¶ 7 (2005).

## III.  Factual Background

Between December 8, 2015 and July 11, 2016, Defendants made at least 57 telephone calls to Plaintiff Estey part of ADT's 2G/3G Conversion Campaign. These calls had a dual purpose: one of the purposes of the calls was to set up an appointment to upgrade Plaintiff's ADT cellular alarm monitoring equipment from 2G technology; the other was to use this appointment to upsell additional ADT products and services. One of the calls Plaintiff received makes these dual purposes clear, as Defendants' agent stated the following:

> I am calling today to follow up on a recent letter that ADT mailed to you regarding the cellular communicator of your security system. Mr. Estey, I am reaching out to inform you that your system currently uses 2G wireless technology, which cellular carriers will be phasing out and moving all networks to 3G technology. Therefore, your security system's 2G unit needs to be replaced. Now, Mr. Estey, I am going to make it easy for you to get your new 3G unit installed at no cost, **and possibly upgrade your system to continue to keep your home safe.**

Furthermore, Defendant ADT openly bragged about its use of these appointments to upsell customers. In its Q1 2016 Conference Call, Defendant ADT stated: "In Q1 we incurred $24 million of radio conversion costs as we successfully converted 124,000 2G customers, a portion of which we were able to upsell to

ADT Pulse." In its Q2 2015 Conference Call, Defendant ADT stated: "In Q2 we continued to make progress on our 2G radio conversion project, upgrading 82,000 customers, a portion of which we were able to upsell to ADT Pulse." In an investor day presentation dated May 14, 2015, Defendant ADT wrote, on a slide titled "Improving Attrition: We Have Significantly Increased Pulse Among New & Existing Customers", that it "[l]everaged 2G to 3G conversion opportunities to upgrade to Pulse."

On multiple occasions, Plaintiff requested that calls stop or otherwise advised ADT that he was not interested in setting up an appointment. For example, on May 19, 2016, Plaintiff engaged in the following conversation with ADT:

ESTEY:     You guys have called me about this several times, and continue to send letters. I really don't want to do it right now. I'm not interested in doing it right now. So, could you please stop calling me about it.

ADT:     Um, sir, it's mandatory that we get this done before January of 2017 due to the fact that if we do not, it will interrupt your services and you will not have any cont- ADT will no longer have monitoring with your system.

ESTEY:     Right, I understand that.

ADT:     OK

ESTEY:     And I will get that done whenever I have time, but in the meantime, I don't want to have calls from you anymore.

Despite these requests, Defendant continued to make calls to Plaintiff as part of the 2G/3G Conversion Campaign. ADT claims that a request like the one above is insufficient to be added to its "do not call" list, because Plaintiff Estey made this request in conjunction with a specific campaign and did not specifically reference the list when requesting not to be called. *Doc. 57*, pp. 7, 12. Further, even if Plaintiff Estey had been added to this list, in May 2016, ADT stopped requiring iPaceSetters to scrub its call lists against ADT's internal do not call list, in blatant violation of the regulatory requirements.

## IV. The Proposed Class Satisfies Each of the Prerequisites for Certification

Fed. R. Civ. P. 23(b) provides that "[a] class action may be maintained" if two conditions are met: the suit satisfies the criteria set forth in subdivision (a) (i.e., numerosity, commonality, typicality, and adequacy of representation), and it also fits into one of the three categories described in subdivision (b). "By its terms this creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Associates v. Allstate Ins.*, 130 S. Ct. 1431, 1437 (2010). In deciding whether to certify a class, a district court has broad discretion. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1669 (11th Cir. 1992). "Class certification is normal in litigation under [the TCPA]." *Ira Holtzman, C.P.A., & Assocs. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). Other courts have certified cases alleging similar

violations of the TCPA. *See Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015).

Accordingly, Plaintiff seeks to certify a class defined as:

> All persons within the United States to whose cellular or residential telephone number Defendant ADT LLC placed (or had placed on its behalf), since November 23, 2012, two or more telephone calls in a twelve-month period as part of its 2G to 3G conversion campaign.

## A. <u>Numerosity</u>

The numerosity prerequisite of Rule 23(a) requires that the class and sub-class be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1). Generally, 40 or more members will satisfy the numerosity requirement. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). "Impracticable" does not mean "impossible." *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 674 (N.D. Ga. 2003). If it would be extremely difficult or inconvenient to join all members of the class, considering the size of the class, the geographical dispersion of the class, the ease of class member identification, the nature of the action, and the size of each class member's claim, joinder is "impracticable." *See Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981); *Red v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 666 (N.D. Ga. 2001). "In determining whether the proposed class contains a sufficient number of members, the Court is permitted to 'make common

sense assumptions in order to find support for numerosity." *Campos v. ChoicePoint, Inc.*, 237 F.R.D. 478, 485 (N.D. Ga. 2006) (quoting *Evans v. U.S. Pipe & Foundry*, 696 F.2d 925, 930 (11th Cir. 1983))

Numerosity is met here. This is a nationwide class with putative class members all over the country. Further, Defendant ADT has admitted in discovery that its "Operations Service Center" ("OSC") called 40 or more unique customers at least twice as part of the 2G/3G conversion campaign. (Exhibit A, Response 3.) ADT has furthered admitted that it called 40 unique persons at least two times each in a 12-month period as part of the 2G/3G Conversion Campaign. (Exhibit B, Responses 1, 2.) These admissions alone are sufficient for numerosity.

ADT contends numerosity is not met based on the mistaken belief that the class "must be composed of individuals who claim that ADT did not adhere to its own do-not-call policies and procedures *after* they asked to be placed on ADT's do-not-call lists." *Doc. 57*, p. 10 (*emphasis* added). However, the law prohibits making *any* telemarketing call if ADT's procedures for compliance were inadequate or not implemented with respect to the 2G/3G campaign *prior* to the initiation of the calls. 47 C.F.R. § 64.1200(d); *Simmons* (supra). Accordingly, the class is defined as including those persons called on the 2G/3G campaign without regard to whether or not such class member individually made a do not call request. ADT acknowledges that "the number of members of Mr. Estey's proposed

class is likely in the hundreds of thousands." *Doc.* 57, p. 21. Since ADT has admitted more than 40 such persons are in the class as defined, numerosity is satisfied. *Cox* at 1553.

## B. **Commonality.**

Rule 23(a)(2) requires Plaintiffs to show, as a prerequisite to class certification, that "there are questions of law or fact common to the class." This requirement does not require a large number of common questions, but rather "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Not all questions of law or fact need to be common, nor do they need to predominate over individual issues in order to satisfy commonality. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). For the purposes of Rule 23(a)(2), even a single common question will do. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977 (11th Cir. 2016). This is a "low hurdle" to overcome. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

The principle issues in this case are as follows:

1) Do the calls made by the Defendants as part of the 2G/3G Conversion Campaign constitute telemarketing as defined by 47 C.F.R. § 64.1200(f)(12).

2) If so, did Defendants institute and fully implement the minimum procedures required by 47 C.F.R. § 64.1200(d) before making the calls.

That is it. There is no issue of consent to be determined, because telemarketing calls placed in the absence of the required policies are a violation, even if the caller had consent to make that call.[4] The 2003 amendments to section 64.1200(d) (previously 64.1200(e)(2)) to encompass all *telemarketing*, rather than just *telephone solicitations*, expressly removed the "prior express invitation or permission" exemption. *Cf.* 47 C.F.R. § 64.1200(f)(12) (2015) (defining *telemarketing*); 47 C.F.R. § 64.1200(f)(14) (2015) (defining *telephone solicitation*).

Telemarketing under the TCPA is defined by the purpose of the calls, rather than their content. 47 CFR § 64.1200(f)(12); *see also Dkt. 34* (Order at pp. 4-6 discussing dual purpose calls); *Golan v. Veritas Ent., LLC*, 788 F. 3d 814, 820 (8th Cir. 2015). Whether calls made as part of the 2G/3G Conversion Campaign constitute telemarketing is a common question for all class members. If they are not telemarketing, the claims of plaintiff and the class fail. If they are telemarketing, then the claims of Plaintiff and the class will rise or fall on whether the Defendants instituted and fully implemented procedures in compliance with the

---

[4] Indeed, a "consent" defense to a claim involving failures to implement procedures to allow for a person to stop calls makes little sense. First, it allows a company to avoid class action liability by doing the very thing the law prohibits (not maintaining the minimum internal do not call procedures). Second, "they said we could call" does not mean that a company does not still have to implement procedures to potentially allow those persons to tell the company to stop.

minimum requirements of 47 C.F.R. § 64.1200(d). *Simmons*, 2016 U.S. Dist. LEXIS 42091.

## C. Typicality

Typicality is satisfied when the claims of all class members, including the named Plaintiffs, "arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). That some "plaintiffs may have suffered greater damage than other [putative class members] … does not render them atypical." *Id.*

Plaintiff and the class members are customers, or former customers, of ADT who were called by Defendants as part of the 2G/3G Conversion Campaign. They were subject to calls on the same campaign, for the same purposes, and with the same procedures in place. While Plaintiff Estey did not ultimately make an appointment on which it was intended that he be upsold, this is irrelevant. The question at hand is whether Defendants calls were made with the requisite telemarketing purpose (that is, to sell its products on the call or at some point in the future, such as on the conversion appointment). It does not matter whether Defendant was able to *realize* that purpose. *Golan* at 820. Accordingly, typicality is satisfied.

## D. Adequacy

To satisfy the requirement that a proposed plaintiff is able to fairly and adequately protect the interests of the class, that plaintiff bears the burden of showing that "no substantial conflicts of interest exist between the representative[] and the class" and that "the representative[] will adequately prosecute the action." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). The existence of minor conflicts will not defeat class certification. *Id.* Only a fundamental conflict, going to the specific issues in controversy, may defeat class certification. *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000). So long as all class members share common objectives and the same factual and legal positions and have the same interest in establishing the liability of defendants, the conflict is not fundamental. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). Speculative or hypothetical conflicts will not defeat class certification. *Id.* Courts must also consider whether the proposed class' counsel possess the qualifications and experience to conduct the litigation. *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987).

Plaintiff understands his responsibilities as the class representative. (Exhibit D.) Not only will Plaintiff Estey adequately prosecute the action, he has done so for nearly a year now. Plaintiff Estey has remained involved in this litigation throughout, including thoroughly responding to Defendant's written discovery requests. In addition, given the identical nature of the claims between Plaintiff and

the class members, there is no potential for conflicting interests in this action. Plaintiff and the class members seek statutory damages as the result of Defendants' telephone calls. There is no antagonism between the interests of the Plaintiff and those of the class. Accordingly, the adequacy requirement has been satisfied with respect to Plaintiff Estey, and Plaintiff Estey should be appointed as the class representative.

Furthermore, Plaintiff is represented by counsel experienced with the handling of consumer class actions and TCPA cases, and proposed class counsel will vigorously protect and work for the interests of the Class. *See* Decl. of Jeremy Glapion; Decl. of Justin T. Holcombe.

Accordingly, the adequacy requirement is met with respect to Plaintiff's counsel, and the Court is requested to appoint Jeremy M. Glapion, James M. Feagle, Kris Skaar, Justin T. Holcombe, and Cliff R. Dorsen as class counsel.

**E. Predominance**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Predominance "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Common questions of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every

member's entitlement to injunctive and monetary relief. On the other hand, common issues will not predominante … if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191 (11th Cir. 2009). Where "a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue in the ensuing litigation." *Kernats v. Comcast Corp.*, Case No. 09-cv-3368, 2010 U.S. Dist. LEXIS 112071, *23 (N.D. Ill. Oct. 20, 2010); *see also Martinez v. Wells Fargo Bank, N.A.*, 307 F.R.D. 630, 645 (S.D. Fla. 2015).

Here, the common questions (whether the calls are telemarketing and whether Defendants properly instituted the required procedures) not only predominate, but are really the only questions that must be answered. Defendants' 2G/3G Conversion Campaign's policies, goals, scripts, and parameters were set via objective documentation. If that documentation shows those calls to be telemarketing, and it is determined that Defendants did not implement the minimum standards with which it must comply prior to making telemarketing calls, Defendants are liable. Class members' claims will rise and fall on the resolution of these issues. And as discussed previously, there is no need to ascertain whether persons actually made an appointment, because whether the calls were telemarketing depends on the purpose of the calls, whether that purpose was

realized or not. There are also no separate damages calculations because the TCPA provides for statutory damages. *See* 47 U.S.C. § 227(c)(5). The issues that often create a predominance dispute in a TCPA matter – such as consent – are simply not present here. Accordingly, predominance is met.

## F. Superiority

"In addition to finding that common questions predominate over individual inquiries, in certifying a class under Rule 23(b)(3), the Court must find that the class action vehicle is superior to other available methods for adjudication." *Domestic Air*, 137 F.R.D. at 693. Among the factors to be considered are the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A-D).

"In determining superiority, courts also consider the anticipated amount of recovery for each plaintiff. Class actions are particularly appropriate where multiple lawsuits would not be justified because of the small amount of money sought by the individual plaintiff. See Advisory Committee Note to 1996 Amendment to Rule 23." *Israel v. Avis Rent-a-Car Sys.*, 185 F.R.D. 372, 387 (S.D.Fla. 1999). "The *realistic* alternative to a class action is not 17 million

individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative — no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied — to no litigation at all." *Carnegie v. Household Int'l, Inc.*, 376 F. 3d 656, 661 (7th Cir. 2004).

Absent class treatment in this case, each individual member of the Class would be required to present the same or essentially the same legal and factual arguments, in separate and duplicative proceedings, the result of which would be a multiplicity of trials conducted at enormous expense to both the judicial system and the litigants. Such a result would be neither efficient nor fair to anyone, including Defendants.

Moreover, there is no indication that members of the Class have a strong interest in individual litigation, let alone any incentive to pursue their claims individually, given the small amount of damages likely to be recovered relative to the resources required to prosecute such an action. Indeed, Plaintiff is aware of no other TCPA litigation currently pending or previously filed against Defendants related to the 2G/3G Conversion Campaign.[5] This is likely because while the TCPA provides for damages of up to $500 for each such violation, or $1,500 for a

---

[5] Defendant ADT was previously sued for TCPA violations unrelated to the 2G/3G Conversion Campaign. *Desai v. ADT Security Services Inc.*, 11-cv-01925 (N.D. Ill.). *Desai* settled for $15 million, and was finally approved on June 21, 2013.

willful or knowing violation, 47 U.S.C. § 227(c)(5), without providing for an award of attorney's fees, many or most class members likely do not have the time or resources to file a small claims case, the resources or desire to hire an attorney, or the volume of calls it would take to convince an attorney to take the case on contingency. Many class members are likely unaware they even have a claim, given the general lack of public familiarity with the TCPA and its nuances.

Furthermore, class certification will promote consistency of rulings and judgments, giving all parties the benefit of finality. Accordingly, the superiority requirement is satisfied.

## G. <u>Ascertainability</u>

"[A] plaintiff seeking to represent a proposed class must establish that the proposed class is 'adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012). "Although not explicit in Rule 23(a) or (b), courts have universally recognized that the first essential ingredient to class treatment is the ascertainability of the class." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 679 (N.D. Ga. 2016) (citation and internal quotation omitted). The precise contours of the class need not be ascertained before certification so long as the class members can be identified "at some stage of the proceeding." *Id.* (quoting *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 952 (11th Cir. 2015) (unpublished)). However, this requirement does not require an

overly strict degree of certainty, and it is to be liberally applied. *Buford v. H&R Block, Inc.*, 168 F.R.D. 340, 347 (S.D. Ga. 1996).

The class definition must "contain[] objective criteria that allow for class members to be identified in an administratively feasible way." *Karhu*, 621 F. App'x at 946; *see also Mullins v. Direct Digital, LLC*, 795 F. 3d 654, 659 (7th Cir. 2015) (Classes must "be defined clearly and based on objective criteria") (*citing* William B. Rubenstein, *Newberg on Class Actions* § 3:3 (5th ed. 2015); Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:2 (11th ed.2014)). Class certification is the norm in TCPA litigation. *See, e.g.*, *Ira Holtzman, C.P.A.*, 728 F.3d at 684 (collecting cases); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015); *Sandusky Wellness Center v. Medtox Scientific*, 821 F. 3d 992 (8th Cir. 2016) (finding TCPA class ascertainable);

The proposed class definition is as follows:

> All persons within the United States to whose cellular or residential telephone number Defendant ADT LLC placed (or had placed on its behalf), since November 23, 2012, two or more telephone calls in a twelve-month period as part of its 2G to 3G conversion campaign.

For a 227(c) claim based on the regulations found at 47 CFR 64.1200(d), all that matters is whether the calls constitute telemarketing, and if so, whether ADT implemented the mandated minimum internal "do not call" list procedures. Consent, or lack thereof, is irrelevant – a person who gave consent to a company

that did not properly implement any one of the mandated procedures and who received two or more telemarketing calls in a 12-month period still has a claim under the statute. The violation is the initiation of the calls without having, or without fully implementing, the minimum requirements. *Charvat*, 561 F.3d at 632. Plaintiff Estey's experience and discovery to date indicate that Defendant failed to implement the minimum procedures (for example, by not requiring iPaceSetters to check if persons it was meant to call were on ADT's "Do Not Call" list, and requiring "magic words" to the point that "I don't want to have calls from you anymore" is insufficient). *See Krakauer*, 311 F.R.D. 384 (rejecting "magic words" argument in granting class certification).

Put simply, to ascertain class membership, the only question that needs to be answered is the following: "Did a potential class member receive two or more telemarketing telephone calls in a twelve-month period from ADT (on its behalf) as part of its 2G to 3G conversion campaign?" All such person's claims will rise or fall on the following common questions: 1) were calls made as part of the 2G/3G Conversion Campaign "telemarketing"; and, if yes, 2) did ADT properly implement all of the minimum requirements of 47 CFR 64.1200(d). The rest – such as their locations and identities for notice purposes – can be found via ADT's customer records.

Indeed, Defendant maintains such records. As seen in the production of the log of calls made to Plaintiff Estey, Defendants maintain call logs of outbound calls. (Exhibit E, Response 1.) Furthermore, the Knapp affidavit makes clear that it maintains records of persons called as part of the 2G/3G Conversion Campaign. (*See* Exhibit C, Knapp Affidavit.) Finally, Defendant ADT has admitted in discovery that it keeps "records of [its] customers' names, addresses, and telephone numbers." (Exhibit A, Response 5.) Accordingly, it can be ascertained from Defendant's own records 1) when a call made as part of the 2G/3G Conversion Campaign was placed, 2) to whom the call was placed, 3) how many calls were placed to each person; and 4) the identity of the person to whom the call was placed. This is all of the information needed to ascertain class membership.

The class is thus clearly defined based on objective criteria, and class members are thus ascertainable.

## V.     Conclusion

In light of the foregoing, Plaintiff respectfully requests that the Court 1) certify the class as defined herein; 2) appoint Plaintiff Estey as representative of the certified class; 3) appoint Jeremy M. Glapion, James M. Feagle, Kris Skaar, Justin T. Holcombe, and Cliff R. Dorsen as class counsel; and 4) grant any further relief the Court deems necessary or warranted.

**CERTIFICATE OF COMPLIANCE WITH LR 5.1B & 7.1D, NDGa.**

Pursuant to LR 7.1D, NDGa., I certify that this document has been prepared with one of the font and point selections approved by the court in LR 5.1B, to wit: Times New Roman, 14 point.

**Dated**: June 12, 2017

/s/ Justin T. Holcombe
Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
Kris Skaar
Georgia Bar No. 649610
kskaar@skaarandfeagle.com
133 Mirramont Lake Drive
Woodstock, GA 30189
770 / 427-5600
404 / 601-1855 fax

James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
Cliff R. Dorsen
Georgia Bar No.149254
cdorsen@skaarandfeagle.com
2374 Main Street
Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com