UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BRADLEY ESTEY, on behalf of himself and all others similarly situated, | Civil Case No.: 16-cv-3141 |
| Plaintiff, | Judge: Hon. Amy Totenberg |
| v. | |
| ADT LLC, iPacesetters LLC, | |
| Defendants. | |

## Plaintiff's Opposition to Defendant's Motion for Summary Judgment

### Introduction

Defendant ADT LLC, on its own and through its agent iPacesetters, placed calls to Plaintiff and putative class members' telephone numbers, ostensibly to schedule an appointment to upgrade Plaintiff and class members' alarm systems from expiring 2G technology to newer 3G technology. But Defendants' call campaign[1] was a Trojan Horse: Defendant ADT intended to, and did, use the "free upgrade" appointments to upsell its customers on premium products, making the calls to set those appointments "telemarketing."

Accordingly, Plaintiff – who Defendants continued to call after he asked Defendant ADT to stop – brought suit against ADT and iPacesetters regarding their

---

[1] Hereinafter, this is referred to as the "2G to 3G Conversion Campaign."

failure to establish and *actually implement* the minimum procedures for maintaining an internal do not call list, as required by the regulations promulgated by the FCC to implement the TCPA. 47 C.F.R. § 64.1200(d); 47 U.S.C. § 227(c). Defendants now move for summary judgment asserting two primary arguments: 1) Defendants had appropriate procedures for dealing with telemarketing calls, and 2) Plaintiff's experience alone is insufficient to create a genuine issue of material fact that Defendants' procedures were inadequate.

However, Defendants miss the point. No matter what telemarketing procedures were written, Defendants admit that those procedures were not actually implemented or followed with respect to the 2G to 3G Conversion Campaign, especially as of May 6, 2016. (Doc. 66, p. 5 citing Def. SOF 52-53 (acknowledging that Defendants stopped scrubbing against their do-not-call lists on that date)). Defendants "stopped" following these procedures on the supposed belief that by changing the *content* of their call scripts to omit references to upselling, the calls were no longer telemarketing.[2] *Id.* However, Defendants never once allege that they

---

[2] Defendants do not actually request summary judgment on the telemarketing question. Rather, their motion argues that they established and implemented the minimum procedures required by the regulation. One such procedure is that do-not-call requests be honored. 47 C.F.R. § 64.1200(d)(6). Based on Defendants' admission that they ceased honoring do-not-call requests with respect to the 2G to 3G Conversion calls on May 6, 2016, Defendants' motion must, at minimum, be denied as to all calls from May 6, 2016 to present.

stopped using the 2G to 3G Conversion appointments to upsell, which Defendant ADT has made clear was one of the purposes of these appointments (and thus, one of the purposes of the calls to set the appointments). As this court has already determined, it is the *purpose* of the call, not just its *content*, that determines whether the call is telemarketing. (Doc. 34 (Order).) A call to set up an appointment wherein ADT intended to attempt to sell additional goods or services constitutes telemarketing, even if the caller does not inform the consumer of this purpose during the call.

With respect to the pre-May 6, 2016 calls, Defendants all but admit those calls were indeed telemarketing. *See* (Doc. 66, p. 4 (acknowledging that ADT offered upgrades to "Pulse" for an added cost).). In a carefully worded statement, Defendants argue that those calls did not violate the TCPA because they implemented and followed the required telemarketing procedures with respect to those calls by, for example, scrubbing their call lists to remove all numbers from persons who had asked not the be called "for telemarketing purposes." (Doc. 66, p. 4; Doc. 66-2, DiGiorgio Decl., ¶ 27.) However, the regulation requires anyone engaging in telemarketing to record any "request from a residential telephone subscriber[3] not to receive calls from that person or entity." 47 C.F.R. §

---

[3] Made applicable to cellular telephone subscribers by 47 CFR 64.1200(e).

64.1200(d)(3). Defendants' procedures were insufficient because it was their policy not to treat a request not to receive calls generally (or not to receive calls regarding a specific campaign) as a do-not-call request. Rather, Defendant ADT's procedure required magic words such as "do-not-call list" or "telemarketing."

This is one of the critical differences between this case and *Simmons v. Charter Comm.*, Case No. 15-cv-317, 2016 U.S. Dist. LEXIS 42091, *40 (D. Conn. 2016) *aff'd* 2017 U.S. App. LEXIS 6004 (2nd Cir. 2017). In *Simmons*, the court held that a single failure to record and honor an individual consumer's do-not-call request was evidence of a failure to implement proper procedures, but it could not be the *sole* basis of such violation. *Id.* However, here, Defendants failure to honor Plaintiff Estey's requests not to receive calls was not a misunderstanding or a representative who forgot to record his request. Rather, it was fully consistent with their actual policy not to record and honor requests not to receive calls with respect to the 2G to 3G Conversion Campaign because such request was not an absolute request not to receive *telemarketing* calls. It is this bad *policy*, among others, on which Plaintiff's claims are based, not the failure to record a single request. For these reasons, Defendants' Motion must be denied.

### Legal Standard

"Summary judgment may only be granted when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Camacho v. Nationwide Mut. Ins. Co.*, 13 F. Supp. 3d 1343, 1349 (N.D. Ga. 2014) (citing Fed. R. Civ. P. 56(c).) The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrates the absence of a genuine issue of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, and only then, does the burden shift "to the non-movant to establish, by going beyond the pleadings, that there is indeed a genuine issue as to the material facts[.]" *Id.*

"When ruling on the motion, the Court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor." *Id.* "[W]here a reasonable fact finder may draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Id.* (quotation omitted.) Unless the evidence is "so one-sided that one party must prevail as a matter of law", summary judgment should be denied. *Id.*

## Factual Background

The premise of this case is simple: Defendant ADT LLC and the call center it hired, Defendant iPaceSetters, placed telephone calls to Plaintiff Estey and putative class members to schedule appointments for a campaign that would allow Defendant

would update the 2G communications technology in customers' alarm systems with 3G communications technology. ("2G to 3G Conversion Calls.") (Defendant's Statement of Undisputed Material Facts ("DSUMF", ¶ 48.) Rather than limit these appointments strictly to the free-of-charge 2G to 3G conversions, however, Defendant sought to use these appointments to upsell, just as it did on all of its other appointments with customers. (Plaintiff's Statement of Undisputed Material Facts ("PSUMF"), ¶ 1.) Indeed, Defendant ADT openly told its investors about its success in using these appointments to upsell, and its intent to continue to do so. (*Id.*) On many of the calls, this purpose was made clear, and references to upgrades beyond the 2G to 3G upgrade were explicit on the calls. (DSUMF, ¶¶ 49-50.) As such, the content of those calls (references to paid upgrades) and one of the purposes of those calls (to use the 2G to 3G Conversion Campaign appointments to upsell customers) were each independently sufficient to make the calls telemarketing.

Eventually, Defendant appears to have stripped the telemarketing content from the calls. (DSUMF, ¶¶ 52-53.) But Defendant does not argue that it stopped using the 2G to 3G Conversion appointments to upsell. To the contrary, Defendant ADT told repeatedly told investors it used, and would continue to use, the appointments to upsell (which would make the calls to set these appointments telemarketing). (PSUMF, ¶ 1.)

As these calls were telemarketing (due to their content and/or purpose),

Defendants were required to document and maintain "do not call" requests; to honor "do not call requests" that had been made; to train its personnel and vendors on the existence and use of its internal "do not call" list, all things the TCPA requires prior to making telemarketing calls. 47 C.F.R. § 64.1200(d); 47 U.S.C. § 227(c). (Plaintiff's Second Amended Class Action Complaint, ¶¶ 29-39, 80-84.) The record developed to date[4] in this matter shows these failures, and these failures serve as the basis for the instant litigation.

First and foremost, Defendants continued to call Plaintiff after telling Defendant ADT "I don't want to have calls from you anymore." (DSUMF, ¶¶ 61, 63.) Defendant has taken the untenable position that because Plaintiff made his "do not call" statement in response to a specific calling campaign, this clear request did not require adding his number to the "do not call" list because it was "a request by a customer to stop calling about a specific service campaign" rather than "an all-purpose revocation of consent[.]" (Doc. 66-2, DiGiorgio Decl., ¶ 27; PSUMF, ¶¶ 8-10.)

Second, Defendant has also been unable to produce a signed telemarketing-training acknowledgement form for any of the persons who placed calls to Plaintiff

---

[4] The record developed to date is still early with respect to the merits of this case, as discovery was bifurcated. (Doc. 16 ("The Court will set a schedule for class discovery in the event Plaintiff's [Motion for Class Certification] is granted.").) That Plaintiff already has sufficient evidence to oppose Defendant's Motion for Summary Judgment speaks volumes about what is likely to come when the parties get into the merits of the case.

on ADT's behalf, despite claiming all persons making telemarketing calls were required to sign such a form, and has even admitted that one of its departments that made such calls was not required to undergo telemarketing training. (PSUMF, ¶¶ 2-3.)

Finally, Defendants have also conceded that as of May 6, 2016, Defendant ADT stopped scrubbing (and stopped requiring Defendant iPacesetters to scrub) Defendant ADT's list of numbers to be called as part of the 2G to 3G Conversion Campaign against its internal "do not call" list, which would make it impossible for Defendant ADT to honor those "do not call" requests and, as a result, impossible to comply with the requirements of the TCPA. (DSUMF, ¶ 52; Doc. 66-2, DiGiorgio Decl., ¶ 28; PSUMF, ¶¶ 4-7.)

## Argument

For convenience, Plaintiff breaks this brief into two sets of 2G to 3G Conversion Calls: calls made prior to May 6, 2016, and calls made on or after May 6, 2016. This is derived from Defendants' contentions that after May 5, 2016, Defendants changed their procedure to 1) cease references to upgrading on the calls themselves and 2) begin calling customers on its do-not-call list. (Doc. 66, pp. 4-5, 22.) Accordingly, though there is some overlap, Plaintiff will discuss these calls separately.

I. <u>**Calls Before May 6, 2016**</u>

### a. There is a Genuine Issue of Material Fact Regarding Whether Calls Made Prior to May 6, 2016 Were Telemarketing.

#### i. Defining Telemarketing

Telemarketing is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 CFR § 64.1200(f)(12). The key word in this definition is "purpose." For example, the Eighth Circuit has held in the TCPA context that "[w]hile the content of the calls controlled whether they were 'advertisements,' their purpose controlled whether they were 'telemarketing.'" *Golan v. Veritas Ent., LLC*, 788 F.3d at 820. The Ninth Circuit held similarly: "[n]either the [TCPA] nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). Whether a call is telemarketing should be approached "with a measure of common sense." *Id.*

Specifically, in *Golan*, defendant left a message stating: "Liberty. This is a public survey call. We may call back later." 788 F.3d at 819. Defendant argued that its phone message did not contain an advertisement or qualify as telemarketing. The court agreed that because the message did not mention property, goods, or services, it was not an advertisement. *Id.* However, recognizing the distinction between *advertising* and *telemarketing* in the TCPA, the court wrote "[w]hile the content of the calls controlled whether they were 'advertisements,' their purpose controlled

whether they were 'telemarketing.'" *Id.* at 820. It found that the calls, though they did not mention any product or service, were part and parcel of a campaign to promote a movie. *Id.* Accordingly, the calls were telemarketing.

*In Chesbro*, the court found that prerecorded messages from Best Buy informing customers that their "Reward Zone" certificates were about to expire were both informational *and* telemarketing, because the calls urged the recipient to redeem the RewardZone points before they expired and thanked the recipient for shopping at Best Buy. 705 F.3d at 918. The court concluded that "[b]ecause the calls encouraged recipients to engage in future purchasing activity, they … constituted telemarketing under [47 C.F.R. § 64.1200(f)(12)]." *Id.* at 918.

The FCC has also repeatedly reiterated a purpose-based approach to determining whether calls are telemarketing. In 2003, the FCC wrote that calls made to "inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services" would be telemarketing. 2003 FCC TCPA Order, 18 FCC Rcd. 14014, 14098 ¶ 142 (F.C.C. 2003). It further wrote that "[i]f the call is intended to offer property, goods, or services for sale either during the call, or in the future … that call is an advertisement." *Id.* The FCC held the same in 2012. 2012 FCC TCPA Order, 27 FCC Rcd 1830, 1842 ¶ 30.

Accordingly, in determining whether there is a genuine issue of material fact

as to whether Defendant's calls were telemarketing, the Court must consider evidence about both the content of the calls and the purpose of the calls, as either would be sufficient to make the 2G to 3G Conversion Calls telemarketing.

**ii.** <u>The Content and the Purpose of the Pre-May 6 Calls to Plaintiff Estey Make the Calls Telemarketing</u>.

To be perfectly clear, Defendant does not appear to contest that the pre-May 6 calls were telemarketing. *See* (Doc. 66, p. 4 (acknowledging that ADT offered upgrades to "Pulse" for an added cost).) This is for good reason – the calls were plainly and indisputably telemarketing. On several of the calls to Plaintiff Estey, the telemarketing purpose is made explicit. For example, on two of the calls, Defendant's representatives stated, in part:

> I am calling today to follow up on a recent letter that ADT mailed to you regarding the cellular communicator of your security system. Mr. Estey, I am reaching out to inform you that your system currently uses 2G wireless technology, which cellular carriers will be phasing out and moving all networks to 3G technology. Therefore, your security system's 2G unit needs to be replaced. Now, Mr. Estey, I am going to make it easy for you to get your new 3G unit installed at no cost, **and possibly upgrade your system to continue to keep your home safe.**

(Doc. 66-6, Frazier Declaration, Exhibits A, C.) (Emphasis added.) The statement that the appointment would be used to "possibly upgrade your system" after already explaining the appointment would be used for the 2G to 3G Conversion indicates that something more than the 2G to 3G Conversion upgrade was being contemplated. Defendant's Motion also appears to give this away, explaining in a declaration that

"[p]rior to May 5, 2016, the 2G call scripts offered customers the option of replacing their 2G radios with 3G radios at no cost, or of upgrading to 'Pulse' service, which equipment included a self-contained 3G radio. Because the offer of the "Pulse" option could be categorized as a 'telemarketing' call …" (DiGiorgio Decl., ¶ 22.)

The purpose of the calls was clear as well, even apart from the content. Defendant repeatedly told its investors that it leveraged the 2G to 3G Conversion Campaign appointments to upsell premium ADT products. For example, in its Q2 2015 Earnings Report Conference Call, Defendant ADT stated "[i]n Q2 we continued to make progress on our 2G radio conversion project, upgrading 82,000 customers, a portion of which we were able to upsell to ADT Pulse." (Exhibit A.) In an investor day presentation dated May 14, 2015, Defendant ADT wrote, on a slide titled "Improving Attrition: We Have Significantly Increased Pulse Among New & Existing Customers", that it "[l]everaged 2G to 3G conversion opportunities to upgrade to Pulse." (Exhibit B, p. 29.) In its Q4 2015 Earnings Report Conference Call, Defendant ADT stated that it expected "Pulse upgrades to temporarily increase in 2016 as we make a push to convert the remaining 2G customers to Pulse versus just replacing the radios." (Exhibit C.)  Defendant ADT also stated that throughout 2016 it would be "actively seeking to upgrade 2G customers to Pulse, but those that won't we'll just have to replace their radios." (*Id.*) Finally, in its Q1 2016 Earnings Report Conference Call (the last available call), Defendant ADT stated: "In Q1 we

incurred $24 million of radio conversion costs as we successfully converted 124,000

2G customers, a portion of which we were able to upsell to ADT Pulse." (Exhibit

D.) In that same conference call, Defendant ADT stated that "[i]n addition to new

Pulse sales, we also upgraded about 48,000 existing customers this quarter, including

some customers we upgraded while converting them from 2G radios." (*Id.*) When

pressed, Defendant ADT stated that 13,000 of the 48,000 Pulse upgrades were 2G

conversions. (*Id.*)

As such, there is a genuine issue of material fact whether these calls were

telemarketing.

      **b. There is a Genuine Issue of Material Fact Regarding Whether Defendants' "Do Not Call" Procedures Were Adequate and/or Followed.**

            **i. Defendant ADT's Focus on "Magic Words" Makes its Policies Inadequate.**

While Defendant ADT takes the position that its policies were thorough, a

closer look reveals that they were anything but. Chief among the inadequacies in

Defendant ADT's policies is that it appears to have required "magic words" in order

for someone to be added to Defendant's internal "do not call" list. In the "ADT

Telemarketing Policies and Procedures Supplemental Procedures

Acknowledgement form" – which, according to Defendant ADT, all employees

engaged in telemarketing are required to review and sign – Defendant instructs:

Any prospective customer that *specifically* states, "**DO NOT CALL**

**ME**" or, "**I want to be placed on your DO NOT SOLICIT LIST**"
must have an account set up in TELEMAR and dispositioned "**DNS**."
They also must be dispositioned "**DNS**" through the Gryphon
Telemarketing Tool.

(Doc. 66-2, DiGiorgio Decl., Exhibit C.) (*italic* emphasis added)(**bold** emphasis in

original). Failure to follow this procedure would subject an employee to

"disciplinary action up to and including termination." (*Id.*)

Defendants' continued calls to Plaintiff Estey were a manifestation of

Defendant ADT's flawed and inadequate policy. On one of the calls to Plaintiff

Estey, Plaintiff responded "could you please stop calling me about it" and also "I

don't want to have calls from you anymore." (Doc. 66-6, Frazier Decl., Exhibit H.)

According to ADT, because Plaintiff Estey said the word "it" in the first of these

two requests, this entire exchange was construed as a request to "stop calling about

a specific service campaign" which "would not necessitate adding that customer's

cell phone number to ADT's 'Do Not Call' list[.]" (Exhibit E, Response 4.)

Defendant doubles down on this argument in its brief, writing that Plaintiff's request

was insufficient because Plaintiff did "not ask the operator to place his number on

ADT's iDNC list." (Doc. 66, p. 20.) Further, in Maria DiGirogio's declaration, she

states that Plaintiff Estey's request was not related to telemarketing, and "[t]hus,

ADT was not required to – and in fact did not – treat Mr. Estey's statement during

the May 19, 2016 [sic] as a request to be placed on ADT's internal do-not-call list."

(Doc. 66-2, DiGiorgio Decl., ¶ 33.)

ADT's insistence on magic words and that any "do not call" request be made in the context of telemarketing runs afoul of the terms of the TCPA and subsequent FCC orders and interpretations. The TCPA itself states as follows:

> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a *request from a residential telephone subscriber not to receive calls from that person or entity*, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made.

47 CFR § 64.1200(d)(3) (emphasis added). The plain terms of the law are such that *any* request not to receive calls requires the caller to place the requester's number on the internal "do not call" list, regardless of whether the request addresses telemarketing or not, and regardless of whether it uses magic words. In theory, Plaintiff Estey could have made his request during a debt collection call, and Defendants would have still been required to place Plaintiff Estey's number on its "do not call" list. ADT's "magic words" requirements violate the TCPA.

## ii. Defendant ADT Admittedly Did Not Train All of its Telemarketing Employees.

Despite Defendant ADT's contention that all agents making telemarketing calls were required to sign a telemarketing-training acknowledgement form, Defendant has admitted that "ADT's OSC [Operations Service Center] employees are not required to sign the 'ADT Security Services Telemarketing Policy Statement'

… or the 'ADT Telemarketing Policies and Procedures Supplemental Procedures Acknowledgement form.'" (Exhibit F, Response 3.) Presumably, this means OSC employees were not required to undergo telemarketing training, as Defendant wrote has claimed that each agent that went through the telemarketing training was required to sign such forms. (Doc. 66, pp. 9-10; Doc. 66-2, DiGiorgio Decl., ¶¶ 11-14.) Yet Defendant states that it used the OSC to make 2G to 3G Conversion Calls. (Exhibit E, Response 7.) If these calls were telemarketing, Defendant's failures to train employees engaged in such telemarketing on its internal "do not call list" violate the TCPA.

## II.   Calls On or After May 6, 2016.

### a.  Defendants Do Not Provide Any Basis for Summary Judgment For Calls Made On or After May 6, 2016.

As mentioned previously, Defendant does not provide any basis for summary judgment on calls made on or after May 6, 2016. Defendants go into detail about their "compliant" policies and procedures that were in place and ostensibly followed prior to May 6, 2016, but defensively claim that they were not obligated to comply with any telemarketing regulations after the contents of the calls were stripped of any references to upgrading or upselling. *See* (Doc. 66, p. 20 ("Because the call did not engage in telemarketing, ADT was not obliged to conform the May 19 call, or any later call, to the do-not-call rules; those rules apply only to telemarketing

calls.").) Defendants reiterate this belief several times throughout. (*See id.* at pp. 5, 22.)

Defendants, as the movants, "bear[] the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record before the court] which it believes demonstrates the absence of a genuine issue of material fact." *Camacho*, 13 F. Supp. 3d at 1349. Defendants' failure to argue, let alone show by evidence, that they "continued" to comply with the policies and procedures in place for telemarketing calls for this group of calls would alone be sufficient to deny Defendants' Motion with respect to these calls. Indeed, not only did Defendants not make this argument, they freely admit that Defendant ADT suspended many of its policies with respect to 2G to 3G Conversion Calls made on or after May 6, 2016. (Doc. 66-2, DiGiorgio Decl., ¶¶ 26, 28

### b. There is a Genuine Issue of Material Fact Whether Calls On or After May 6, 2016 Were Telemarketing.[5]

Defendants claim that telemarketing content was stripped from calls made on or after May 6, 2016. But, as discussed above, whether a call is telemarketing is not just about its content. A call which purports to be for a non-telemarketing purpose will still be telemarketing if one of the purposes of such a call is to sell the consumer

---

[5] Defendant does not seek summary judgment on the issue of whether these calls constitute telemarketing. However, Plaintiff addresses this issue out of clarity and an abundance of caution.

goods or services in the future. Telemarketing content might be sufficient to render a call telemarketing, but it is not necessary. Defendants present no evidence that the purposes of these calls changed; rather, they only present evidence that the calls themselves no longer informed the consumer of the true telemarketing purpose of the appointments.

To the contrary, there is no doubt that Defendant ADT viewed the 2G to 3G Conversion Campaign appointments as opportunities to upsell. As discussed above, Defendant ADT told its investors on numerous occasions that it had successfully used its 2G to 3G Conversion appointments to upsell customers on ADT Pulse and that it would continue to do so. (Exhibits A-D.) Defendant ADT even seemed preemptively disappointed that it would not be able to successfully upsell all customers, stating in November 2015 that throughout 2016, it would be "actively seeking to upgrade 2G customers to Pulse, but those that won't we'll just have to replace their radios." (Exhibit C.) Rather than treat upselling on these appointments as an afterthought, Defendant ADT appears to have considered the upselling purpose to be on equal footing with the 2G to 3G conversion purpose.

Defendants say nothing in their Motion to indicate that this upselling policy changed. This silence alone would be sufficient to deny Defendants' Motion, given their burden. Furthermore, logically speaking, there is no reason to independently infer that this policy *did* change. If Defendant ADT believed that stripping

telemarketing content from the calls was alone sufficient to make the calls no longer subject to telemarketing rules, DiGiorgio Decl., ¶ 28, it would have no reason to also stop using the appointments to upsell.

Defendant has also admitted in discovery that all of its appointments were used to upsell. In its Supplemental Responses to Plaintiff's First Requests for Production, Defendant wrote, in justifying its statements to investors:

> ADT rolled out its Pulse service offering in 2010. Since that time, ADT has consistently promoted that platform in an attempt to maintain and grow its business in a highly competitive market and provide a more complete home security and automation platform to its customers.
>
> The fact that ADT continued to promote its ADT Pulse offerings to all of its customers during this time does not specifically connect it to the 2G/3G calling campaign, nor does it transform the operational purpose of the 2G/3G calls made to customers in order to replace their 2G radio.
>
> …
>
> Like any ADT customer (2G affected or not) an ADT Pulse System was always an alternative option available[.]"

(Exhibit G, Response 18.) In other words, according to Defendant ADT, its statements to its investors that it used, and would continue to use, 2G to 3G Conversion appointments to upsell were simply consistent with its policy to use all engagements with its customers to upsell. If this is true, then, by definition, engagements with customers on 2G to 3G Conversion appointments were to be used to upsell.

In short, the only change Defendants have put forward relates to changing the

content of the call scripts as of May 6, 2016. They essentially acknowledge that the calls prior to that date were telemarketing. (Doc. 66, p. 4.) However, there is no evidence, nor do Defendants argue, that anything changed about Defendant ADT's desire, goal, and intention to use the appointments to upsell. Because the purpose of the calls was to set up these appointments, the calls after May 6, 2016 are just as much telemarketing as the calls which preceded it. The only difference is that Defendants stopped being forthcoming with its customers.

### c. There is a Genuine Issue of Material Fact Whether Defendants Complied with Mandated Procedures for Calls Made On or After May 6, 2016.

Defendants admit that for calls made on or after May 6, 2016, they suspended one of the most important policies when it comes to honoring "do not call" requests: Defendant ADT stopped scrubbing persons on its "do not call" list from its 2G to 3G Conversion Call lists, and directed iPacesetters to do the same. Doc. 66, p. 5; Doc. 66-2, DiGiorgio Decl., ¶ 26.) This admission is consistent with the discovery conducted to date.

In a May 6 email, Eric Petrosevich, then a Director for ADT's National Sales Centers, sent an email to several ADT and iPacesetters employees regarding a change to the process of scrubbing telephone numbers against ADT's do not call list, writing that "with the list only getting provided weekly, this would have IPacesetters contacting a customer who has asked to be on the DNC repeatedly until we get the

next list. Are we stating this is ok?" (Doc. 66-2, DiGiorgio Decl., Exhibit I.) In response, Renata Bergman, Senior IT Specialist for ADT's Third Party & Contact Compliance, responding that "[t]he ADT DNC scrub requirement is being withdrawn[.]" (*Id.*) If Defendant ADT no longer scrubbed the list of persons to be called as part of the 2G to 3G Conversion Campaign against its internal "do not call" list, and stopped requiring Defendant iPacesetters to do the same, and those calls were telemarketing, Defendants have admittedly run afoul of the TCPA's requirement that they honor a person's do not call request. 47 CFR § 64.1200(d)(3, 6).

Second, and as discussed above, despite Defendants' contention that all agents making telemarketing calls were required to sign two telemarketing-training acknowledgement forms, Defendant ADT has stated both that OSC 1) was used to make 2G to 3G Conversion Calls and 2) was not required to sign the telemarketing forms (or, presumably, to undergo telemarketing training). If the post-May 6 calls are telemarketing, Defendants' failure to train its agents responsible for making such calls runs afoul of the TCPA's requirement that "personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list." 47 CFR § 64.1200(d)(2).

Accordingly, because there are genuine issues of material fact as to whether the May 6-or-later calls were telemarketing, and whether Defendants implemented

their internal do-not-call list policies with respect to such calls, Defendants' Motion for Summary Judgment should be denied.

## III.   *Simmons v. Charter Comms., Inc.*

Defendant disingenuously states that Plaintiff rests his entire case on *Simmons v. Charter Comms., Inc.*, 222 F. Supp. 3d 121 (D. Conn. 2016) because Plaintiff cited to this case in his Memorandum in Support of Class Certification. (Doc. 66, p. 7.) To be perfectly clear, Plaintiff's case rests on the clear language and requirements of the law, which Defendant ADT appears to view as little more than suggestions, as it finds itself in its second TCPA class action.

While *Simmons* provides a thorough overview of the TCPA's requirements, the facts in *Simmons* are wildly different than those at the bar. In *Simmons*, the plaintiff's *only* evidence for violations of 47 CFR § 64.1200(d) was that defendant did not have a written "do not call" policy (which it had) and that because defendant called him after he asked to be on its "do not call" list, it must have failed to implement proper procedures to honor do not call requests. *Simmons*, 222 F. Supp. 3d at 138-141. The court held: "[t]he existence of a single failure to record and honor an individual's request to be placed on a DNC list can be evidence of a failure to implement proper procedures [cites omitted], but it cannot be the sole basis of a section (d)(3) violation." *Id.* at 140. After noting that a subsequent request by Simmons was honored, the Court determined "[t]here is evidence to suggest that

Simmons' request was not properly understood… It is also possible that the representative simply forgot to record the request. In any event, evidence of a single violation of an entity's recording policy does not establish a complete failure to implement such a policy." *Id.*

Here, to the contrary, while Defendant's failure to honor Plaintiff's "do not call" request is "evidence of a failure to implement proper procedures prior to the initiation of a call," *Simmons*, 222 F. Supp. at 140, there is much more to it. Defendant has admitted that as a matter of *policy* it would not treat Plaintiff's request as a "do not call" request. Defendant has admitted that as a matter of policy it relied on untrained personnel in its OSC department to make 2G to 3G Conversion Calls. Defendant has admitted that it stopped scrubbing its 2G to 3G Conversion Call lists against its "do not call" list for calls made on or after May 6, 2016. If any or all of these 2G to 3G Conversion Calls were telemarketing, Defendant violated the TCPA.

Whereas the *Simmons* plaintiff asked the Court to infer policy deficiencies from a potentially isolated incident, Defendant here has shrugged its shoulders and outright admitted to various deficiencies in its policies. Defendants do not contend that the conduct towards Mr. Estey was the result of a mistake that happened notwithstanding the implementation of proper procedures. Rather, they contend that they followed their procedures perfectly. Accordingly, while *Simmons* is instructive on the law, its fact-specific conclusion is inapposite.

## Conclusion

In light of the foregoing, Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

## CERTIFICATE OF COMPLIANCE WITH LR 5.1B & 7.1D, NDGa.

Pursuant to LR 7.1D, NDGa., I certify that this document has been prepared with one of the font and point selections approved by the court in LR 5.1B, to wit: Times New Roman, 14 point.

**Dated**: August 18, 2017

/s/ Justin T. Holcombe
Justin T. Holcombe
Georgia Bar No. 552100
jholcombe@skaarandfeagle.com
Kris Skaar
Georgia Bar No. 649610
kskaar@skaarandfeagle.com
133 Mirramont Lake Drive
Woodstock, GA 30189
770 / 427-5600
404 / 601-1855 fax

James M. Feagle
Georgia Bar No. 256916
jfeagle@skaarandfeagle.com
Cliff R. Dorsen
Georgia Bar No.149254
cdorsen@skaarandfeagle.com
2374 Main Street
Suite B
Tucker, GA 30084
404 / 373-1970
404 / 601-1855 fax

Jeremy M. Glapion
**THE GLAPION LAW FIRM, LLC**
1704 Maxwell Drive
Wall, New Jersey 07719
Tel: 732.455.9737
Fax: 732.709.5150
jmg@glapionlaw.com